# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>YARBROUGH PLASTERING, INC., et al.,<br><br>　　　　Defendants.<br>_____<br>AND RELATED CLAIMS | Case No.: 1:15-CV-01811- JLT<br><br>ORDER GRANTING YARBROUGH'S MOTION FOR SUMMARY JUDGMENT AND DENYING PROBUILDER'S MOTION FOR SUMMARY JUDGMENT<br><br>(Docs. 31, 32) |

　　　　Yarbrough was a drywall/stucco subcontractor on three tracts of homes built by Lenox Homes.  In the subcontractor agreement, Yarbrough was obligated to obtain insurance to indemnify Lenox from claims arising out of Yarbrough's performance of the subcontract.  To do this, Yarbrough contracted with ProBuilders for an insurance policy.

　　　　In this action, ProBuilders seeks to recover deductibles it claims that Yarbrough owes under the insurance contract related to its settlement of three cross-complaints for indemnity filed by Lenox.  ProBuilder's contends that Yarbrough owes a deductible as to every plaintiff in the underlying lawsuits against Lenox but Yarbrough claims it owes a deductible only as to each of the three cross-complaints for indemnity. The parties have filed cross-motions for summary judgment.

　　　　The Court determines that the individual plaintiffs in the underlying lawsuits were not

"joined" in a "suit" against Yarbrough and their demands for money do not constitute claims on the ProBuilders policy. Therefore, Yarbrough's motion for summary judgment is **GRANTED** and ProBuilder's motion for summary judgment is **DENIED**.

## II.     Undisputed Facts

Yarbrough Plastering performs stucco and drywall services for new home construction. (Undisputed Stipulated Fact "USF" 1) These homes include single-family custom homes and tract homes. Id. Between 2003 and 2006, Yarbrough entered into contracts with homebuilder, Lenox Homes, to provide stucco and drywall services related to tract homes Lenox would build. (USF 2) Three of the contracts related to three housing developments planned by Lenox. (Doc. 31-5 at 268, 324, 405) Each contract required Yarbrough to indemnify Lenox "from any and all claims, demands, liabilities, suits, causes of action, penalties, damages, cost expenses, judgments and losses of every kind and character . . . resulting from property damage . . . arising out of . . . performance of this Agreement . . ." (Doc. 31-5 at 272, 327, 409)

To address the need to indemnify Lenox, Yarbrough obtained general liability insurance from ProBuilders for each year from July 2003 through October 2007. (USF 3) Each of these policies contained language that required Yarbrough to pay a deductible—in the first year it was $4,000 and the subsequent years it was $10,000—per "claim." (USF 4) The policies indicated that a claim "means a request or demand for money . . . because of . . . property damage . . . received by [ProBuilders] or an insured including service of suit . . . against an insured" (USF 6, 7) However, a "[**c**]laim does not include reports of accidents, acts, errors, occurrences offenses or omissions which may give rise to a claim under this policy." Id. The policy defined "suit" as "a civil proceeding in which damage because of  . . . property damage . . . are [sic] alleged." (USF 8, 9) Moreover, the policies required Yarbroough to pay a deductible for "each and every **claim** under this policy, irrespective of the number of claims which may be joined in any one **suit** . . ." (USF 4).

In 2009 and in 2013, in three separate lawsuits filed in the Kern County Superior Court, approximately 636 homeowners sued Lenox for various construction defects in their homes. (USF 11, 12, 15-17; Doc. 31-5 at 232, 301, 335) Lenox cross-complained against its subcontractors,

including Yarbrough. (USF13) Lenox sought defense, indemnity and damages for breach of contract and express and implied warranties. (USF 13, 31-5 at 232, 279, 335) Yarbrough tendered the defense of the lawsuits to its insurance companies, including ProBuilders. (USF 14) ProBuilders contributed $800,000 toward settling the claims brought by the homeowners against Lenox and, in doing so, obtained a dismissal from Lenox of the cross-complaints against Yarbrough. (USF 15, 16, 17) After this, ProBuilders required Yarbrough to pay a deductible—up to the amount incurred—for each home at issue in the lawsuits filed against Lenox. (USF 19) Though Yarbrough has refused to pay 636 deductibles, it has paid a full deductible on each of the three cross-complaints filed by Lenox.[1] (USF 21)

## III. Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); see also Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. See Fed. R. Civ. P. 56 (a), (c); Mora v. Chem-Tronics, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment should be entered only "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the "initial

---

[1] At the hearing, ProBuilders asserted repeatedly that the issues in this case are complicated by the amount of money at issue; the Court disagrees. The importance of the issues does not vary with the amount of money at stake.

3

responsibility" of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Wool v. Tandem Computers, Inc., 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); Matsushita, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. Id. at 586 n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of

the nonmoving party.  Orr, 285 F.3d at 772; Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

### IV. Legal Standards for Insurance Contract Interpretation

California law applies to interpret the insurance contract in this diversity case.  Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co., 546 F.3d 1142, 1145 (9th Cir. 2008). In E.M.M.I. Inc. v. Zurich Am. Ins. Co., 32 Cal.4th 465, 470 (2004), the California Supreme Court set forth the standards for evaluating an insurance contract under California law.

> "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ.Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id*., § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id*., § 1644), controls judicial interpretation. (*Id*., § 1638.)' " (*Ibid*.)
>
> A policy provision is ambiguous when it is susceptible to two or more reasonable constructions. (*Waller, supra*, 11 Cal.4th at p. 18, 44 Cal.Rptr.2d 370, 900 P.2d 619.) Language in an insurance policy is "interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Ibid*.) "The proper question is whether the [provision or] word is ambiguous in the context of *this* policy and the circumstances of *this* case. [Citation.] 'The provision will shift between clarity and ambiguity with changes in the event at hand.' [Citation.]" (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 868, 21 Cal.Rptr.2d 691, 855 P.2d 1263.) Ambiguity " ' "is resolved by interpreting the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation. [Citation.] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. [Citation.]" "This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' " [Citation.] 'Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations.' " (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 763, 110 Cal.Rptr.2d 844, 28 P.3d 889.)

Id.

### V. Discussion and Analysis

#### A. "Claim" and the "per claim deductible"

The parties agree that the policy indicates that a "claim" is when there is a demand for money *because of*, for example, property damage resulting from poor workmanship.  (Doc. 31-5 at 4-5)  The parties agree also that the contract requires Yarbrough to pay a deductible for every

1   claim made. (Doc. 31-5 at 3)  The disagreement concerns whether, in these circumstances, claims
2   made in the lawsuit against Lenox are, in fact, claims made against Yarbrough such to require a
3   deductible for each home at issue. Toward this end, ProBuilders argues that because Lenox sued
4   Yarbrough, all of the claims in the each of the underlying suits "are joined" together such to
5   require Yarbrough to pay a deductible for each home.² Yarbrough argues that the only claims
6   made against it are those made by Lenox.

7   The parties cite Clarendon American Insurance Company v. North American Capacity
8   Insurance Company, 186 Cal.App.4th 556.  In Clarendon, 116 homeowners sued Tanamera, a
9   residential developer, for construction defects.  Id. at 560.  Tanamera tendered its defense of the
10  lawsuit to Clarendon and NAC, its insurance companies.  Id.  Clarendon accepted the tender,
11  defended the action on a reservation of rights and eventually settled the case.  Id.  The insurance
12  policy required that the SIR amount of $25,000 applied to "each and every claim made against any
13  insured, to which this insurance applies, regardless of how many claims arise from a single
14  occurrence or are combined in a single suit." Id. at 562.  On this basis, NAC refused the tender and
15  asserted that its obligation to defend did not arise until Tanamera satisfied its $25,000 self-insured
16  retention as to each of the eight homes covered by the NAC policy.  Id. at 561.  NAC argued that
17  though there was only one lawsuit against Tanamera, there were eight claims combined in it. Id. at
18  564.  Clarendon took the position that Tanamera was obligated to exhaust only one SIR because
19  only one lawsuit was filed and only one settlement was achieved  Id. at 561, 563.

20  On appeal, the court reversed the grant of summary judgment issued in NAC's favor and
21  found that NAC failed to show that the only reasonable interpretation of the insurance policy was
22  that the SIR applied to each of the eight homes at issue. Clarendon at 567.  The court found
23  noteworthy that the policy failed to define the word "claim" but that the policy intended that
24  "claim" and "suit" to have different meanings.  Id.

25  Even assuming the definition of "claim" as "a demand for payment," the court noted that

---

² As noted aboveee, ProBuilders takes the position that despite that many co-owners made separate demands for
28  payment in the underlying cases, there is only one claim her home.  The insurance policy does not require this
interpretation and it is unclear why ProBuilders believes it does.

the insurance policy contemplated that more than one claim could be contained in one suit but also that only one claim could be contained in one suit. Clarendon at 569.  Thus, the court concluded that a reasonable interpretation was that only one deductible applied. Id. at 571.  The court held, "Based on the terms of the NAC policy as a whole, including the SIR endorsement, we discern no reason why the term "claim" must be understood as referring to each home involved in the Bradley action, rather than to some other touchstone or demand for payment involved in that action. As used in the SIR endorsement, the term "claim" is susceptible to both Clarendon's and NAC's proffered meanings. It could reasonably be understood as referring to the Bradley action as a whole, or to any number of demands for payment involved in that suit, whether for each homeowner, each home, or the various construction defects alleged in the action." Id. at 352.

The court found also that NAC failed to show that Tanamera "could not have had an objectively reasonably expectation that the $25,000 'per claim' SIR would apply only one time to a single construction defect lawsuit involving numerous homeowners and homes, such as the Bradley action." Clarendon at 573.  The court noted that NAC did not provide any evidence as to the reasonable expectations of Tanamera. Id. at 574-575.  The Court observed,

> Still, there is no showing of the number of homes Tanamera reasonably expected the policy would cover at the time the policy was issued. Did Tanamera reasonably expect that the policy would cover as many as 450 homes constructed after November 30, 2002? Although the policy defined "project" as 450 single-family homes, the record does not provide an answer to this question. The number of homes Tanamera reasonably expected would be covered by the policy has a substantial bearing on whether Tanamera had an objectively reasonable expectation that the $25,000 "per claim" SIR would apply to a single suit involving any number of homes, or would apply to each home potentially covered by the policy— regardless of the number of suits filed.
>
> Indeed, assuming Tanamera reasonably expected the policy would potentially cover 450 homes, it is questionable whether a reasonable insured in Tanamera's position would have agreed to pay a $404,320 premium for a policy with a $2 million aggregate liability limit, and subject to a $25,000 "per claim" or "per home" SIR, which the insured was obliged to satisfy *before* NAC had a duty to defend the insured in any suit involving any number of allegedly defective homes. If so, that would mean the insured contemplated paying the $404,320 premium plus SIR's totaling $11.25 million (450 times $25,000) in exchange for $2 million in maximum liability coverage on 450 homes, *before* NAC had a duty to defend the insured in a single action involving all 450 homes.

Id.

The parties rely also on Evanston Ins. Co. v. North American Capacity Ins. Co., 2014 WL

3362258, at *1 (E.D. Cal. July 8, 2014). In Evanston, both parties were insurance companies who provided coverage to Berry & Berry. Id. Evanston took up Berry & Berry's defense and sued NAC when it refused to do so. Id. NAC argued that until Berry & Berry met its $10,000 per claim self-insured retention, NAC had no duty to defend. Id. NAC's policies noted, "*The self-insured retention (retained limit) applies to each and every claim made against you, regardless of how many claims arise from a single occurrence or are combined in a single suit*, and the company has not [sic] duty to defend you unless and until the amount of the retained limit has been exhausted by payment of settlements, judgments, or claims expense." Id. Likewise, the policy read, "The "retained limit" for each and every claim arising as the result of an "occurrence"... shall be: [¶] $10,000.00 [¶] regardless of the number of claims from a single occurrence, suits brought or the number of claims incorporated into one such suit." Id. at 2. The policy defined "claim" as "a request or demand received by any insured or the Company for money or services, including the service of suit or institution of arbitration proceedings against any insured." Id. It defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harm." Id.

In the underlying action, Berry & Berry was sued in five separate actions which claimed the property owners suffered property damage due to faulty construction. Evanston, 2014 WL 3362258, at *2. Evanston defended Berry & Berry in each litigation and sought NAC's participation in the defense by arguing that because Berry & Berry had paid $10,000 as to each lawsuit, the self-insured retention level was met and NAC's duty to defend had arisen. Id. NAC argued that Berry & Berry owed a deductible as to each of the property owners involved in the lawsuits and not merely as to each lawsuit.   The Court agreed with NAC and determined,

> **Berry & Berry could not reasonably believed that the SIR retention applied only a single time to an entire suit without regard to the number of claims it contained. As an illustration, plaintiffs in the underlying suits could have filed each claim individually rather than as a group. In such a case, Berry & Berry could not reasonably have believed that only a single SIR would apply.** Further, the SIR endorsement specifically indicates that the SIR applies equally "regardless of the number of claims from a single occurrence, suits brought or the number of claims incorporated into one such suit." Such language would be of no effect if claims that could have been brought separately were subject to only a single SIR when brought together. Although this language may be onerous, it is unambiguous. In this case, the SIR could not reasonably be interpreted to apply as Plaintiff argues.

8

> Rather, the only reasonable interpretation is that the SIR applies on a per-home basis.

Evanston, 2014 WL 3362258, at *5.

The Court agrees with the Evanston in large part. As in Evanston, the insurance contract requires that Yarbrough to pay a deductible as to every claim. As in Evanston, the Court agrees that if it accepted the argument that only one deductible is required no matter how many claims are made in a lawsuit, this would eviscerate the contract provision that requires Yarbrough to pay a deductible for each claim, regardless of the number of claims are joined in a single lawsuit. However, due to important factual differences between this case and Evanston, the Court comes to a different result here and finds the situation closer to the one set forth in Clarendon.

First, the policy provisions are similar to those in Clarendon. Though "claim" was not defined in Clarendon, the accepted definition of the word—a demand for payment—is similar to the definition here but, as in Clarendon, ProBuilders' argument to the contrary, this definition does not resolve the issues. As in Clarendon, here the policy indicates that many claims could be contained in one lawsuit but it allows also that a lawsuit could have only one claim.

Second, the ProBuilders policy anticipated claims for indemnity rather than only direct claims of liability. Indeed, that was the purpose of obtaining the policy (*see* Doc. 32-3 at 2 ¶¶ 4-5) was for possible demands for indemnity by Lenox rather than for poor workmanship—which is not covered. Indeed, as noted above, the policy defines a "claim" as,

> [A] request or demand for money or services **because of** . . . **property damage**, . . . received by us or an insured including the service of suit or institution of arbitration proceedings against an insured.

(Doc. 31-5 at 4) The phrase, "because of," ensures coverage for indemnity claims. Had the parties intended the policy to be limited only to collateral property damage claims, the contract would have read, "*for* property damage" rather than "*because of* property damage."

In addition, though the policy indicates that Yarbrough owes a deductible for every claim no matter how many are "joined" in a single suit, the usual understanding of the word "joined" in this situation is what the homeowners did here. They joined together and formed three groups and

each group filed a lawsuit.[3] Importantly, there is no indication that the homeowners contemplated making a claim or ever made a claim on the policy or took any steps to "join" Yarbrough in their lawsuits.

Likewise, it does not appear to have been the intention of the parties when forming the insurance policy to transform claims *not made on the policy* into claims *made on the policy* through the mechanism of a cross-complaint for indemnity. If this was the intention, it would have been a simple matter to require a deductible for "each and every **claim** under this policy, irrespective of the number of claims ***raised directly or indirectly against the insured*** in any one **suit** . . ." rather than referring to the number of claims "joined" in any one suit.[4] Thus, the arguments of ProBuilders and of Yarbrough as to the meaning of the phrases in the policy are reasonable. Consequently, the Court finds the policy is ambiguous.

Yarbrough submits evidence that the purpose of the policy was to protect against claims of indemnity, not to protect against claims of work defects which are not insurable. Yarbrough points to the contracts with Lenox which required it to obtain insurance coverage for indemnity claims. (Doc. 32-1 at 7-8) On these facts, it argues that it was an objectively reasonable expectation that only one deductible applied per lawsuit given the fact it anticipated lawsuits only by Lenox. First, the homeowners' causes for breaches of warranties *could not be* brought against Yarbrough with whom they were not in privity. Second, the causes of action based upon poor workmanship, likewise could not be brought against the policy because there is no coverage for this.

Yarbrough notes further that Lenox paid it only about $6,000 per house so that agreeing to a deductible of $10,000 per house (the latter policies with this higher deductible covered about 70% of the homes at issue) made no sense. (Doc. 32-1 at 17) Yarbrough argues also that this deductible amount coupled with the premiums would not have shifted any risk of loss to ProBuilders and would have maintained all risk of loss on Yarbrough.

---

[3] Also, it is contrary to common sense to suggest that by Lenox filing the cross-complaint it "joined" the various claims into one lawsuit against Yarbrough because the "joining" together of the homeowners occurred before Lenox filed its cross-complaint.

[4] On the other hand, had ProBuilders intended that "claims" could be made indirectly through a complaint against one as to whom the insurance policy was intended to defend and indemnify, the policy could have simply said so.

Thus, unlike in Evanston, it appears reasonable that Yarbrough did not reasonably believe that a deductible for every home could have been required in circumstances like these where it was sued only by Lenox for indemnity. Indeed, unlike in Evanston and despite ProBuilders' characterization of its actions in the underlying litigations, ProBuilders did *not* settle 636 claims by the homeowners; instead, it settled three lawsuits brought by Lenox against Yarbrough. While this had the practical effect of settling the 636 claims made against Lenox, this does not translate into 636 claims brought against the ProBuilders insurance policy. Given these facts, Yarbrough argues that it would have been an objectively unreasonable for it to have expected to pay 636 deductibles.

ProBuilders offers little explanation to support its interpretation of Yarbrough's objective reasonable expectation except to state that the homeowners *could have* sued Yarbrough directly and had they done so, Yarbrough would be required to pay a deductible per house.[5] However, the Court disagrees that what could have happened should control over what did, in fact, happen. Indeed, it is undisputed that Yarbrough was obligated to pay a deductible as to every claim made on the ProBuilders policy. However, this does not inform the Court's decision related to this current factual circumstance where they did not do so and Yarbrough did not anticipate that they could.

In any event, under California law, the Court is obligated to evaluate the policy based upon the situation the parties encountered, not on situations they did not encounter. Clarendon at 566-567; E.E.M.I., 32 Cal.4th at 470-471 ["The proper question is whether the [provision or] word is ambiguous in the context of *this* policy and the circumstances of *this* case."] For the same reason, the analyses set forth in Capitol Indem. Corp. v. Miles, 978 F.2d 437 (8th Cir. 1992) or Atlas Underwriters, Ltd. v. Meredith-Burda, Inc., 231 Va. 255, 255 (1986) do not change the outcome.

---

[5] ProBuilders argues also that equitable considerations require Yarbrough to pay a deductible for each plaintiff in the underlying litigation. (Doc. 31 at 19-20) Toward this end, it argues that the insurance policy was not designed to cover liability stemming from poor workmanship. Id. Thus, ProBuilders argues that requiring reimbursement from the deductible for the amount paid to settle the claim guards against coverage disputes and insures that "the coverage remained ample if Yarbrough was sued for a major claim . . ." Id. However, this rationale breaks down because the policy was never intended to address poor workmanship and given the amount at issue in the three lawsuits from which Lenox's claims stemmed, clearly, these were major claims. Likewise, it seems clear that ProBuilders made no effort to determine whether the homeowners' claims arose from poor workmanship by Yarbrough—which would not be covered—arose from another subcontractor's poor workmanship which caused collateral damage to the drywall and stucco or whether the damage to the drywall and stucco were collateral effects of Yarbrough's poor workmanship.

Likewise, in the other cases cited, Western Heritage Ins. Co. v. Asphalt Wizards, 795 F.3d 832 (8th Cir. 2015), Washington Occupational Health Associates, Inc. v. Twin City Fire Ins. Co., 670 F.Supp. 12 (D.D.C. 1987), Atlas Underwriters, Ltd. v. Meredith-Burda, Inc., 231 Va. 255 (1986), Burlington Cty. Abstract Co. v. QMA Associates, Inc., 167 N.J. Super. 398, 400 A.2d 1211 (App. Div. 1979) and Zurich Am. Ins. Co. v. NewMech Companies, Inc., No., 2014 WL 241760 (D. Minn. Jan. 22, 2014), the plaintiffs asserted their claims directly against the wrongdoer-insured, unlike here.  Thus, the Court has no quarrel with the outcomes of these cases but these authorities do not change the Court's analysis.

The fact that Lenox was subject to three lawsuits in which hundreds of claims were made, does not change the fact that these hundreds of claims were never made on the Yarbrough policies. Moreover, at the hearing ProBuilders did not dispute that the homeowners were not entitled to make a claim on the insurance policies for their claims which sounded in contract (due to the lack of privity with Yarbrough) and ProBuilders made clear also that the claims they raised for poor workmanship were not covered by the policies.  Because ProBuilders drafted the contract, any ambiguous terms must be interpreted in favor of Yarbrough.  Thus, because the contract was ambiguous as to whether a deductible was required for each of the homeowner's claims or only for the three claims for indemnity, judgment must be entered in Yarbrough's favor.

**ORDER**

For the reasons set forth above, the Court **ORDERS**:

1. ProBuilder's motion for summary judgment (Doc. 31) is **DENIED**;
2. Yarbrough's motion for summary judgment (Doc. 32) is **GRANTED**.

IT IS SO ORDERED.

Dated:   **September 29, 2016**          /s/ Jennifer L. Thurston
                                          UNITED STATES MAGISTRATE JUDGE